Filed 11/25/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| REGENT ALLIANCE LTD., | B244652 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC429863) |
| v. | |
| ROUHOLLAH RABIZADEH et al., | |
| Defendants and Respondents. | |

       APPEAL from a judgment of the Superior Court of Los Angeles County.  Daniel J. Buckley, Judge.  Reversed.

       Daar & Newman, Jeffery J. Daar and Michael R. Newman for Plaintiff and Appellant.

       Law Office of Mohammad A. Fakhreddine and Mohammad A. Fakhreddine for Defendants and Respondents.

_____

Regent Alliance Ltd. (Regent) sued three purchasers of children's clothing for conversion, alleging that the purchasers bought, from other defendants, clothing belonging to Regent that those other defendants had converted. The trial court granted the purchasers' motions for summary judgment, and Regent appeals. We reverse.

BACKGROUND

Regent, a Hong Kong corporation that manufactures children's clothing, filed a first amended complaint in 2010 against multiple defendants, including Rouhollah Rabizadeh, Bahram Dahi, and his wife Farahnaz Dahi[1] (the buyer defendants), all three doing business as B&R Clothing and Kids Street. The complaint alleged in its 13th, 14th, and 15th causes of action that Rabizadeh, Bahram, and Farahnaz purchased and resold converted property—children's clothing (the clothing)—from other defendants (the warehouse defendants) including YHK Transportation, Inc., against which the complaint also alleged conversion. YHK had agreed with Regent to store the clothing in YHK's warehouse facility in Carson, California, but after the clothing was delivered to the warehouse and YHK took possession, YHK transferred the clothing without Regent's knowledge to another defendant's warehouse in Commerce. The warehouse defendants, who "had previously converted the Children's Clothing," then sold it to the buyer defendants, who subsequently sold the clothing to others.

In May 2012, Rabizadeh, Bahram, and Farahnaz filed separate motions for summary judgment. The motions argued that because each of the buyer defendants was allegedly a "subsequent converter"—that is, a receiver or transferee of previously converted goods—they could not be liable for conversion because they purchased the goods for value and in good faith, without actual or constructive notice that the goods had been converted.

The trial court granted summary judgment in favor of Rabizadeh, Bahram, and Farahnaz after a hearing on July 25, 2012. The court agreed with the buyer defendants'

---

[1]     For ease of reference, we refer to the Dahis as Bahram and Farahnaz, intending no disrespect.

2

reasoning that innocent purchasers of converted goods are not liable for conversion. The court further determined that the buyer defendants' evidence "meets the initial burden to show that they purchased the clothing under circumstances that did not indicate to a prudent person that the clothing had been stolen" and that Regent did not introduce sufficient contrary evidence to create any material factual disputes. The court accordingly entered judgment in favor of the buyer defendants, and Regent timely appealed from the judgment.

DISCUSSION

Regent argues that the superior court erred when it agreed with the buyer defendants that innocent purchasers of converted goods are not liable for conversion. Reviewing de novo the court's order granting summary judgment (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 60), we agree.

I.    Bona Fide Purchasers of Converted Goods Are Ordinarily Liable for Conversion

"Conversion is generally described as the wrongful exercise of dominion over the personal property of another. [Citation.] The basic elements of the tort are (1) the plaintiff's ownership or right to possession of personal property; (2) the defendant's disposition of the property in a manner that is inconsistent with the plaintiff's property rights; and (3) resulting damages. [Citation.]" (*Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 119.) "Conversion is a strict liability tort. The foundation of the action rests neither in the knowledge nor the intent of the defendant. Instead, the tort consists in the breach of an absolute duty; the act of conversion itself is tortious. Therefore, questions of the defendant's good faith, lack of knowledge, and motive are ordinarily immaterial." (*Burlesci v. Petersen* (1998) 68 Cal.App.4th 1062, 1066.)

The rule of strict liability applies equally to purchasers of converted goods, or more generally to purchasers from sellers who lack the power to transfer ownership of the goods sold. (See, e.g., *State Farm Mut. Auto. Ins. Co. v. Department of Motor Vehicles* (1997) 53 Cal.App.4th 1076, 1081 ["One who buys property in good faith from a party

3

lacking title and the right to sell may be liable for conversion"]; *Culp v. Signal Van & Storage* (1956) 142 Cal.App.2d Supp. 859, 861 ["One who, though honestly and in good faith, purchases personal property from one having no title thereto or right to sell the same is guilty of conversion"].) That is, there is no general exception for bona fide purchasers.

The case of *Strasberg v. Odyssey Group, Inc.* (1996) 51 Cal.App.4th 906 provides a good example of the recent application of these doctrines. After Marilyn Monroe's death, the special administrator of Monroe's estate retained and wrongfully concealed a number of items of value, which she later passed on to her own relatives, one of whom consigned them to the defendant auction house for sale. (*Id.* at pp. 912-913.) The evidence in the action against the auction house for conversion and return of the items was that the auction house had obtained possession of the items without knowledge that they were originally stolen from the estate. (*Ibid.*) But the Court of Appeal held that the auction house's knowledge and good or bad faith are irrelevant to its liability for conversion. "The reason they are defendants in this action . . . is not because they have committed any wrong themselves nor because [the administrator's] wrongful intent is imputed to them. Instead it is because they received possession of the items from one who had no legal title and therefore no right to transfer the items." (*Id.* at p. 919, citing *Harpending v. Meyer* (1880) 55 Cal. 555, 560-561.) Although the defendant was a consignee of converted goods rather than a purchaser of such goods, the case illustrates the point that even when converted goods have changed hands multiple times, an innocent possessor of the goods will still generally be liable for conversion.

The general rule of strict liability for purchasers of converted goods is not new—the California Supreme Court recognized it more than 100 years ago. In *Harpending v. Meyer*, *supra*, 55 Cal. 555, the plaintiff deposited certain jewelry with a bailee, who pawned it to the defendants without the plaintiff's knowledge or consent. (*Id.* at p. 557.) The Court assumed throughout its analysis that the defendants were "innocent *bona fide* purchaser[s]" (*id.* at p. 558) but still concluded that when the defendants "acquired the possession of plaintiff's property by and through the tortious acts of [the bailee], and not

4

otherwise, such possession was tortious from its commencement, and constituted a conversion of the plaintiff's property." (*Id.* at p. 561; see also *Swim v. Wilson* (1891) 90 Cal. 126, 129 ["it is universally held that the purchaser of stolen chattels, no matter how innocent or free from negligence in the matter, acquires no title to such property as against the owner"].)

Nor is the rule controversial. All leading treatises are in accord: "An innocent buyer from one without title or right to sell is ordinarily liable for conversion." (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 716, p. 1039.) "[T]he receipt of possession of converted goods by way of sale, pledge, gift, or otherwise with the intent to acquire a proprietary interest in the goods" constitutes "an act of conversion," and "[t]his is true even where the person receiving possession acts innocently and in reasonable ignorance of the owner's interest in the property." (1 Harper et al., Harper, James and Gray on Torts (3d ed. 2007) § 2.15A, pp. 219, 221; see also *id.* § 2.17, p. 228 & fn. 22 [stating that the same rules apply to a "transferee who accepts delivery of a chattel in consummation of a wrongful transfer by a bailee"].) "Under the traditional common law rule, one who purchases converted goods from one who has no title is himself a converter by the very act of purchase. The purchaser may be wholly innocent, he may pay value for the goods and he may act in good faith. He is nevertheless a converter." (1 Dobbs et al., The Law of Torts (2d ed. 2011) § 72, p. 202.) "[O]ne receiving a chattel from a third person with intent to acquire a proprietary interest in it is liable without a demand for its return by the person entitled to possession, although he takes possession of the chattel without knowledge or reason to know that the third person has no power to transfer the proprietary interest. The mere receipt of the possession of the goods under such circumstances is a conversion." (Rest.2d, Torts, § 229, com. e, p. 448.)

There are recognized exceptions to the general rule of strict liability. Some exceptions are based on circumstances in which "the person transferring possession may have the legal power to convey to a bona fide transferee a good title," as, for example, when "a principal has clothed an agent in apparent authority exceeding that which was

5

intended." (1 Harper et al., Harper, James and Gray on Torts, *supra*, § 2.15A, pp. 220-221.) Another exception concerns goods obtained by means of a fraudulent misrepresentation. If the party who committed the fraud then sells the goods to "a bona fide purchaser" who "takes for value and without notice of the fraud, then such purchaser gets good title to the chattel and may not be held for conversion (though the original converter may be)." (*Id.*, § 2.16, pp. 223-224, fn. omitted; see also 5 Witkin, Summary of Cal. Law, *supra*, § 716, pp. 1039-1040 ["a purchaser for value and without notice that his or her vendor's title to the property is *voidable*, such as where the vendor obtained the property by fraud, is not liable for conversion"].)

The foregoing legal principles apply straightforwardly to the buyer defendants' motions for summary judgment. The buyer defendants concede for purposes of the motions that they purchased converted goods, of which Regent was the true owner. The buyer defendants do not argue that any exception to the general rule of strict liability applies. Rather, they contend that the general rule of strict liability does not exist and that, to the contrary, innocent purchasers of converted goods cannot be held liable for conversion. That is not correct. The superior court therefore erred when it agreed with the buyer defendants' legal contentions, and the summary judgment motions should have been denied.

II.     The Cases Cited by the Buyer Defendants and the Superior Court Do Not Hold to the Contrary

In support of their position, both in the trial court and on appeal, the buyer defendants rely chiefly on two relatively recent decisions of the Court of Appeal, *Oakdale Village Group v. Fong* (1996) 43 Cal.App.4th 539 (*Oakdale Village*) and *Irving Nelkin & Co. v. South Beverly Hills Wilshire Jewelry & Loan* (2005) 129 Cal.App.4th 692 (*Irving Nelkin*). In agreeing with the buyer defendants' reasoning, the trial court relied on the same cases. Properly understood, however, the recent cases do not deviate from the well-established common law principles described in Part I, *ante*.

The relevant passage of *Oakdale Village* is merely a statement of the fraud exception to the general rule of strict liability for purchasers of converted property.

6

In that passage, *Oakdale Village* quotes from a treatise as follows:  "'Although there are many cases in which a person who obtains possession of goods *by fraud* is regarded as liable for conversion thereof, it does not follow that every other person into whose hands the goods have come may be sued for conversion.  Thus, it is a general rule that an innocent purchaser for value and without notice, actual or constructive, that his vendor had secured the goods *by a fraudulent purchase*, is not liable for conversion. [¶] A different result has been reached, however, where the goods are taken from the *fraudulent possessor* with knowledge of the *fraud*, or with knowledge of such facts and circumstances as would have put cautious and prudent men on inquiry, even though full value has been paid for the property, or where, in general, the transactions involved do not operate to transfer the title to the goods.'  (7 Speiser et al., The American Law of Torts (1990) § 24.8, pp. 729-730, fns. omitted; see also 1 Harper et al., The Law of Torts (2d ed. 1986) § 2.16, pp. 189-190; Prosser & Keeton, Torts (5th ed. 1984) § 15, p. 94.)"  (*Oakdale Village*, *supra*, 43 Cal.App.4th at p. 546, italics added.)  The italicized phrases show that the quotation is merely a description of the fraud exception to the general rule of strict liability for purchasers of converted goods—an innocent purchaser who buys from a seller who acquired title to the goods by fraudulent means is not liable for conversion.  And the final clause of the quotation—stating that a purchaser of converted goods is ordinarily liable for conversion if the transactions involved did not operate to transfer title to the goods—is essentially a statement of the general rule, because a purchaser of converted goods ordinarily acquires no title and consequently is strictly liable.

The additional treatise citations in *Oakdale Village* further confirm our interpretation.  The cited treatise sections concern only the fraud exception to the general rule of strict liability, and each of the cited treatises acknowledges the existence and validity of the general rule.  (See 1 Harper et al., The Law of Torts (2d ed. 1986) § 2.16, pp. 189-190 [describing the exception for goods obtained "by fraudulent misrepresentation"]; *id.* § 2.15A & § 2.17, pp. 186-193 & fn. 21 [describing the general rule of strict liability for transferees of converted goods, including goods converted by a

7

bailee]; Prosser & Keeton, Torts (5th ed. 1984) § 15, pp. 93-94 [acknowledging that "a bona fide purchaser of goods from one who has stolen them, or who merely has no power to transfer them, becomes a converter when the purchaser takes possession to complete the transaction," but also recognizing an exception for a bona fide purchaser "of goods which the true owner was originally induced to sell by fraud"].)

We conclude that *Oakdale Village* provides no support for the buyer defendants' contention that there is no general rule (subject to exceptions) of strict liability for purchasers of converted goods. The relevant portion of *Oakdale Village* expressly relates only to the fraud exception, and nothing in the opinion suggests that the court intended a holding that was contrary to the very treatises that the court quoted and cited.

Interpretation of *Irving Nelkin* is somewhat more complex but leads to the same result. *Irving Nelkin* must be read in light of an earlier decision by the same panel, *South Beverly Wilshire Jewelry & Loan v. Superior Court* (2004) 121 Cal.App.4th 74 (*South Beverly*), which concerned related litigation that arose from the same facts. (See *Irving Nelkin*, *supra*, 129 Cal.App.4th at p. 695.) "In both actions, the plaintiffs [were] wholesale jewelry dealers, who . . . sued both Richard Maslan & Co., to whom they had consigned jewelry and gems (the goods), and Richard Maslan the individual, the person they alleged to be the sole shareholder, officer and director of Richard Maslan & Co. . . . Also sued were an individual and four businesses, to whom Richard Maslan had pledged the consigned goods as collateral for loans made to him by such defendants (the lending defendants). The pledges were made despite the fact that written consignment agreements (consignment memoranda) entered into between the plaintiffs and Maslan & Co. prohibited pledging the goods. In both cases, when the consignor plaintiffs learned of the pledging of their goods, they demanded that Maslan return the goods or pay for them, but Maslan refused or was unable to do so. Richard Maslan was ultimately convicted of grand theft by embezzlement for the use he made of the goods. In each case, the plaintiffs sued Maslan for breach of contract and fraud, and sued Maslan and the lending defendants for recovery of personal property and conversion." (*Ibid.*)

8

The first appellate decision in the two related actions was *South Beverly*. In that case, the plaintiff had prevailed on summary adjudication against the lending defendants, and two of the lending defendants petitioned for a writ of mandate directing the trial court to vacate the summary adjudication order. (*South Beverly*, *supra*, 121 Cal.App.4th at p. 77.) In support of the summary adjudication motion, the plaintiff had successfully argued that because of "the common law rule that a thief cannot pass title to stolen property, . . . [the lending defendants] never gained title to the goods that Maslan pawned with them and therefore they are liable to plaintiff for the return of such goods or payment of their value." (*Id.* at p. 79.)

The Court of Appeal did not question the existence or validity of that common law rule. The court did, however, create an exception to that rule, deriving it from certain provisions of the California Uniform Commercial Code (Commercial Code). (See *South Beverly*, *supra*, 121 Cal.App.4th at p. 80.) Under the then-existing version of the statutes, "[h]ad plaintiff filed a Commercial Code financing statement, then for purposes of Maslan's creditors, such as petitioners, title to the goods would have stayed with plaintiff and as between him and those creditors, he would be entitled to possession of the goods. Because of his failure to file the financing statement, and unless he can establish that Maslan was known generally by his (Maslan's) creditors to be substantially engaged in selling goods that belong to others, the effect of the former Commercial Code provisions is that title to the pledged goods passed to Maslan Company, and when Maslan failed to redeem such pledged goods, title passed to the lending defendants, including petitioners. The applicable Commercial Code provisions did not make an exception for circumstances where third parties take for value and without notice in cases involving theft." (*South Beverly*, *supra*, 121 Cal.App.4th at pp. 80-81, italics omitted.)

Accordingly, the court held that "a person who voluntarily relinquishes possession of his property to another in a consignment, and who has the ability to protect his title by means of a Commercial Code filing but does not do so, will not be entitled to the benefit of the common law rule that a thief cannot pass title to stolen property where an innocent third party has taken possession of the property from the consignee for value and without

9

notice. This would be so even when the consignment was made with the directive that the consigned goods not be pledged." (*South Beverly*, *supra*, 121 Cal.App.4th at p. 80.)

*South Beverly* therefore did not reject the common law rule of strict liability for purchasers of converted goods. On the contrary, *South Beverly* expressly recognized the validity of "the common law rule that a thief cannot pass title to stolen property." (*South Beverly*, *supra*, 121 Cal.App.4th at p. 80.) While acknowledging that rule, however, *South Beverly* identified a specific exception to it, based on the Commercial Code. Under that exception, because the plaintiff failed to utilize the available Commercial Code provisions to protect the plaintiff's title to the property, the innocent third parties that purchased the converted goods from the plaintiff's consignee were not liable for conversion.

Less than one year after deciding *South Beverly*, the same panel decided *Irving Nelkin*. The *Irving Nelkin* opinion refers to the prior *South Beverly* opinion and states that the two cases arose from related facts, as set forth above. (See *Irving Nelkin*, *supra*, 129 Cal.App.4th at p. 695.) Again, the defendants included the third party to whom the consigned jewelry was pledged. The key factual difference between the two cases was that, unlike the plaintiff in *South Beverly*, the plaintiff in *Irving Nelkin* did protect its ownership interest in the goods by filing the necessary Commercial Code financing statements. (*Id.* at pp. 695-696.) The court described that factual distinction and stated, "As we explained in *South Beverly*, this circumstance is critical to the viability of plaintiff's conversion claim." (*Id.* at p. 696.) Accordingly, the court briefly explained that the filing of the financing statements rendered the defendant liable for conversion (*id.* at pp. 699-700), and the court then turned to an extended discussion of the two "primary issues" that were presented on appeal, which concerned prejudgment interest and are not relevant here. (*Id.* at pp. 694, 700-704.)

*Irving Nelkin* consequently was not a repudiation of *South Beverly*—it was an *application* of *South Beverly*. That is, *Irving Nelkin* merely applied the doctrine articulated in *South Beverly* concerning consignments, Commercial Code financing statements, and "the common law rule that a thief cannot pass title to stolen property."

10

(*South Beverly*, *supra*, 121 Cal.App.4th at p. 80.) Accordingly, *Irving Nelkin* too provides no support for the buyer defendants' view that a bona fide purchaser of converted goods cannot be liable for conversion.

The buyer defendants base their contrary contention on the following sentence in *Irving Nelkin*: "In cases where the property changes possession more than once, a plaintiff has a cause of action for conversion if the defendant who is sued for conversion took the property from another converter, and took it with actual or constructive notice that the prior conversion took place." (*Irving Nelkin*, *supra*, 129 Cal.App.4th at p. 699.) The buyer defendants interpret that sentence as a rejection of the general rule of strict liability for purchasers of converted goods. The buyer defendants' interpretation is mistaken for three independent reasons.

First, contrary to the buyer defendants' interpretation, the quoted sentence from *Irving Nelkin* is fully consistent with the general rule (subject to exceptions) of strict liability for purchasers of converted property. Again, the sentence reads as follows: "In cases where the property changes possession more than once, a plaintiff has a cause of action for conversion if the defendant who is sued for conversion took the property from another converter, and took it with actual or constructive notice that the prior conversion took place." (*Irving Nelkin*, *supra*, 129 Cal.App.4th at p. 699.) The sentence says that *if* the purchaser of converted goods *does* have notice of the conversion, then the purchaser is liable. That is correct. Either the case falls under the general rule of strict liability, so the purchaser is liable regardless of notice, or the case falls under one of the exceptions to the general rule, in which case the purchaser is liable because the purchaser had notice. Thus, either way, a purchaser of converted goods who has notice of the conversion is liable. If *Irving Nelkin* said that a purchaser of converted goods is liable *only if* the purchaser had notice of the conversion, then that would be a rejection of the general common law rule of strict liability. But that is not what *Irving Nelkin* says.[2]

---

[2] For identical reasons, *DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864 (*DVD Copy Control*), which the purchasers also cite, is fully consistent with the general rule (subject to exceptions) of strict liability for purchasers of stolen property.

11

Second, *Irving Nelkin* was decided less than one year after *South Beverly* and by the same panel, and it arose from the same facts. In *South Beverly*, the panel acknowledged the general common law rule of strict liability for purchasers of converted property but identified a specific exception to that rule. That was the only issue in the case, and all of the analysis in the opinion was devoted to explaining and justifying the exception. (See *South Beverly*, *supra*, 121 Cal.App.4th at pp. 79-84.) It would be unreasonable to infer that, less than one year later, the same panel repudiated the same common law rule that it had accepted in *South Beverly*, and moreover repudiated it in a single sentence with no supporting analysis and in an appeal in which the defendant's liability does not even appear to have been contested. On the issue of liability, *Irving Nelkin* is nothing more than a straightforward application of *South Beverly*. It is not a wholesale departure from the very common law principles on which *South Beverly* was based.

Third, if the court in *Irving Nelkin* did intend to reject the general rule of strict liability for purchasers of converted property, then the decision would be contrary to California Supreme Court authority. The Supreme Court adopted the general rule of strict liability more than 100 years ago and has never deviated from it. (*Harpending v. Meyer*, *supra*, 55 Cal. at pp. 558, 561; *Swim v. Wilson*, *supra*, 90 Cal. at p. 129.) The Court of Appeal cannot overrule the Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

For all of the foregoing reasons, we conclude that the cases cited by the buyer defendants do not support the buyer defendants' contention that innocent purchasers of converted goods cannot be liable for conversion.

---

Similarly to *Irving Nelkin*, *DVD Copy Control* states that "a purchaser of stolen property with actual or constructive notice of the true owner's interests in that property cannot prevail against that owner." (*DVD Copy Control*, *supra*, 31 Cal.4th at p. 882.) Again, that does not conflict with any part of our analysis. If the purchaser had notice, then the purchaser will be liable, because either the purchaser will be strictly liable or, if the case falls under one of the exceptions to strict liability, the purchaser will still be liable because the purchaser had notice.

DISPOSITION

The judgment is reversed, the order granting the buyer defendants' motions for summary judgment is vacated, and the superior court is directed to enter a new and different order denying those motions.  Appellant shall recover its costs of appeal.

CERTIFIED FOR PUBLICATION.


ROTHSCHILD, P. J.

I concur:


CHANEY, J.

JOHNSON, J., Dissenting.

This case squarely presents the question of whether a bona fide purchaser for value can be liable for conversion as a subsequent converter, when he or she had no actual or constructive notice that the purchased goods had been previously converted by the sellers. The majority opinion applies a rule of strict liability as articulated by our Supreme Court in 1880 to extend liability for conversion to such bona fide purchasers without notice. This rule subjects Rouhollah Rabizadeh, Bahram Dahi, and Farahnaz Dahi (the buyer defendants) to tort liability despite the trial court's conclusion that the undisputed facts showed that they were bona fide purchasers who were blameless in their purchase for value, and would in theory also subject to tort liability any subsequent bona fide purchasers of the clothing from the buyer defendants. I find this result unpalatable.

The rigid and formalistic application of the law of conversion favors the original owner, who will almost always prevail against the subsequent bona fide purchaser, and reduces the incentive for the owner to take precautions in delivering possession of the goods. (See Schwartz & Scott, *Rethinking the Laws of Good Faith Purchase* (2011) 111 Colum. L.Rev. 1332, 1339–1340, 1350.) The existence of an exception from tort liability for those who purchase converted goods from a seller who obtained the goods by fraudulent misrepresentation does not redress the inequity inherent in the rule. When a bona fide purchaser makes the decision to buy, the purchaser's good faith means he or she does not have notice that the goods have been stolen or converted (in which case strict liability will still apply and the original owner can prevail in a tort action) or, alternatively, that the original owner delivered them to the seller pursuant to a fraudulent purchase (in which case the purchaser's good faith matters). (See *id.* at pp. 1352–1353.)

Further, the fraud exception is one the subsequent bona fide purchaser is unlikely to be able to invoke. Such a subsequent bona fide purchaser, who has purchased the goods for value with no actual or constructive notice of prior fraud or conversion, will rarely have access to facts to show that the initial converter obtained the goods by fraud. Fraud must be pleaded with specificity, and specific facts to prove fraud will not be

available to a subsequent buyer who purchases in good faith. This is particularly troublesome when, as in this case, the initial alleged converter is not absent or judgment proof. Regent Alliance Ltd. also sued YHK Transportation, Inc., and the other warehouse defendants for conversion. Yet Regent had little incentive to allege and prove fraud against the warehouse defendants. If it did so, it risked helping the buyer defendants (the subsequent bona fide purchasers) to show fraud by the warehouse defendants and thus to mount a good-faith defense to the conversion claim.

The buyer defendants here have done all they can by demonstrating with undisputed facts that they had no actual or constructive notice of wrongdoing by the warehouse defendants from whom they purchased the clothing. Yet the majority leaves them "holding the bag," held liable in tort for their good faith purchase for value. The rule applied to reverse the summary judgment in this case "probably results from an ineffective borrowing from English law in the early nineteenth century," when "as an artifact of the revolutionary period" American courts rejected an early English rule allowing a good faith buyer purchasing in an open market to obtain good title to the purchased goods. (Schwartz & Scott, *supra*, 111 Colum. L.Rev. at p. 1377 & fn. 16.) As applied in this case, the rule raises fairness concerns that prevent me from joining the majority's opinion.

JOHNSON, J.

2